RICHARD B. MAZER
Law Offices of Richard B. Mazer
99 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 621-4100
Fax: (415) 621-4111
Email: richardbmazer@yahoo.com

Attorneys for Defendant
EARL NELSON

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  vs.<br><br>EARL NELSON,<br>  Defendant. | Case No. CR 05-0208-CRB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

**I. INTRODUCTION**

Pursuant to a cooperation Plea Agreement, Earl Nelson entered a plea of guilty to a violation of Title 15 USC 1, Title 18 USC 2, Collusion and Aiding and Abetting. The United States Probation Office prepared a Pre-sentence Report (PSR), prior to the Government's filing of its Sentencing Memorandum, and concluded that the advisory United States Guidelines (USSG) in this case is a Total Level 14, Criminal Category I. After factoring in Earl Nelson's cooperation pursuant to USSG 5K1.1 the Government recommends a USSG Total Level 13.

Earl Nelson comes now before this Court requesting, in light of the minor role Mr. Nelson played in this offense, his cooperation with the government, his personal background and characteristics, including the fact that he is 68 years of age, has no prior arrests or convictions and suffers from serious medical problems, that the Court sentence him to probation.

## II. BACKGROUND

The Court has had the benefit of a thorough PSR. Consequently, it is unnecessary to recount all of the facts related to this offense. However, there are salient factors that bear directly on the Court's sentencing decision that Mr. Nelson wishes to bring to the attention of the Court.

Earl Nelson was born and raised in Marin County. His father was a splicer for the phone company for 35 years and his mother, a homemaker. They are both deceased. Earl Nelson is an only child. He graduated from Sir Francis Drake High School and attended the College of Marin for two years. From 1958 to 1960, Earl Nelson served in the United States Army, having been Honorably Discharged at the rank of E-4, after serving a year in Korea. In 1961, he began his career in the telecommunications field as a commercial phone service salesman for Pacific Telephone and Telegraph. A year after Earl Nelson joined PT&T, he married Judy Maples, a native Texan. Earl and Judy Nelson have been married for 46 years. They have three grown sons, all of whom reside in Sonoma County, California, and all of whom own and operate their own businesses.

Earl Nelson spent his entire 40 year career in the telecommunications industry, working for large corporations, start-up businesses, and established mid-sized companies. Over the years, his responsibilities grew and he achieved a significant measure of success. After two years at Pacific Telephone and Telegraph, Earl Nelson joined E.D. Jones, where he sold inter-com phone systems. Thereafter, Mr. Nelson and two partners formed Westcom, which was acquired by Arcata, and later by General Dynamics. Throughout his association with these three companies over 9 years, Earl Nelson served as general manager. He then started a new company, Project III, a telecommunications consulting firm, of which he was president and owner. The company closed after six years. Then, Earl Nelson joined Mall Telecommunications, working as vice-president of sales for ten years.

In 1990, Earl Nelson joined Cellisys, which, through two acquisitions, became Earl Nelson's employer Inter-Tel. In 1995, Earl Nelson became the General Manager of Northern California for Inter-Tel, the position he occupied at the time of the present offense in 1999-2001. Significantly, in

40 years in the telecommunications industry, spanning association with multiple employers, the present charge is the one and only blemish on Earl Nelson's record.

During his early adulthood, Earl Nelson struggled with alcohol abuse, as did Earl Nelson's father throughout his life. Over 20 years ago, Earl Nelson realized the debilitating effects of his alcohol use and ceased drinking completely. He has been an active member of Alcoholics Anonymous for over 20 years and has sponsored other recovering alcoholics numerous times. Mr. Nelson also served as a volunteer counselor at several recovery centers, including the Alano Club. Realizing the value of the support and aid he received from the AA community, Earl Nelson chose to give back to the community many times during his life.

Now 68 years old, Earl Nelson has endured a number of physical problems. He underwent lower back surgery for a herniated disc in 1986, and cervical spine surgery, during which a stabilizing plate was inserted, in 2005. He had a torn rotator cuff surgically repaired in June 2006. As reported by Earl Nelson's personal physician (see letter of June 20, 2007, attached hereto), Earl Nelson continues to suffer from hypertension, gout, peripheral neuropathy (related to the cervical spine surgery), anxiety syndrome, asthma, and inactive alcohol abuse. Earl Nelson takes numerous medications to manage these conditions.

In December 2001, Earl Nelson retired from his career in the telecommunications industry. He and his wife Judy now live in Sonora and are supported by Social Security and approximately $60,000 per year generated by retirement investments they have made over the years Earl Nelson worked. Their income just supports their modest retirement lifestyle. Earl Nelson did not become a wealthy man in the telecommunications industry.

As the Court is aware, Earl Nelson's decision to plead guilty in this case came after considerable negotiation and soul searching. Proud of his many years of ethical behavior as a businessman, it was difficult for Earl Nelson to conclude that his decision making at Inter-Tel in the context of the E-Rate Program constituted a criminal offense. There is a strong basis for his reluctance, but his decision to enter a plea of guilty is also measure of his taking ultimate responsibility for his actions.

The facts of this case demonstrate that there were individuals, both above and below Earl Nelson in the Inter-Tel hierarchy, who were actively involved with the E-Rate bid planning and approval process. These individuals were far more involved in the E-Rate Program than Earl Nelson.

After introduction to the E-Rate Program, Inter-Tel was to respond to a Request for Proposal, as it had traditionally done for years. However, when E-rate was first brought to the branch, Mr. Nelson found the Requests for Proposals and bidding process to be most unusual. As a result, Mr. Nelson sought guidance from both Inter-Tel's senior executives and legal department, located in Phoenix, Arizona. He sought advice regarding the unusual bid specifications, the requests for donated items, and the bidding process. Mr. Nelson acted only after receiving advice from both corporate and legal, following their instructions to bid to the specifications for the telecommunications section of the bids.

In the West Fresno district, Ms. Green told Inter-Tel employees that if they wanted to participate in the E-rate project, then they should subcontract the bid to Howe Electric. Ms Green told Inter-Tel employees to submit the bid as a "subcontractor" rather than as a direct bidder. She stated that she would ensure that Howe Electric would become the General Contractor for the project. Inter-Tel usually participated in direct bidding as a competitor for business in government contracts. However, as Mr. Nelson has repeatedly stated, submitting bids as a subcontractor was not unusual in his industry. The decision to bid as a subcontractor proved to be the basis for collusion in the West Fresno district to which Mr. Nelson pled guilty. However, it is important to note that under Earl Nelson's supervision, Inter-Tel delivered all of the equipment for which the bids were submitted. Furthermore, under Mr. Nelson's guidance, Inter-Tel, unlike other participants in the E-Rate program connected with Judy Green, never

forgave the school district's "co-pay" in the project.

Earl Nelson has already paid a great deal for his failure to stand fast against the "subcontractor" process of bidding. He ended his career under a cloud. He is embarrassed by his involvement and by his conviction. He will live out his life with this blemish on his record. The price he has and will pay should be viewed in the context of the fact that Earl Nelson received no greater compensation for Inter-Tel's participation in the E-Rate Program. He simply received his usual salary.

### III. APPLICABLE SENTENCING LAW

The landmark decision in United States v. Booker, 160 L. Ed. 2d 621, 125 S.Ct. 738 (2005), changed sentencing in the Federal Courts.  Booker  renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in Title 18 USC 3553(a). The Court found that the mandatory application of the Guidelines was unconstitutional. In the Booker Remedy Opinion, the Court stated:

> "We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C.A. 3553(b)(1) (Supp. 2004), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, 3742(e) (main ed. And Supp. 2004), which depends upon the Guidelines mandatory nature. So modified, the Federal Sentencing Act, See Sentencing Reform Act of 1984, as amended, 18 U.S.C. 3551 *et seq*., 28 U.S.C. 991 *et seq*., makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see 3553(a) (Supp. 2004)." At 651.

Further, with respect to appellate review of sentencing decisions, the Court stated:

> "We infer appropriate review standards from related statutory language, the structure of the statute, and the 'sound administration of justice.' And in this

instance those factors, in addition to the past two decades of appellate practice in cases involving departures, imply a practical standard of review already familiar to appellate courts: review for 'unreasonableness.'"

. . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." Booker, at 660-661.

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in Rita v. United States, 127 U.S. 2456, 168 L.Ed. 2d 203 (2007) and instructed that a within Guideline sentence is presumed reasonable only upon *appellate review*. The Court stated:

> "We repeat that the presumption before us is an *appellate* court presumption. Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. *18 U.S.C. § 3552(a); Fed. Rule Crim. Proc. 32.* He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines, to apply, *USSG § 5K2.0*, perhaps because the Guidelines sentence itself fails properly to reflect *§ 3553(a)* considerations, or perhaps because the case warrants a different sentence regardless. See *Rule 32(f)*. Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. See *Rules 32(f), (h), (i)(1)(C) and (i)(1)(D)*, see also *Burns v. United States, 501 U.S. 129, 136, 111 S. Ct. 2182, 115 L.Ed. 2d 123 (1991)* (recognizing importance of notice and meaningful opportunity to be heard at sentencing). In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Booker, 543 U.S. at 259-260, 125 S.Ct. 738, 160 L. Ed. 2d 621.*" at 214.

Further, the Court instructed:

> "The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable." at 216.

6

The Supreme Court has now articulated the process by which sentencing and appellate courts must implement the findings in Booker, including the admonition of Rita. The court has directed:

> "As we explained in Rita, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. . . . He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.
>
> . . . Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. . . . But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the §3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall v. United States, 128 S.Ct. 586, 596-597, 169 L. Ed. 2d 445 (2007) (citations and footnotes omitted).

Before Gall and Rita, the 9th Circuit anticipated their instructions. It directed the sentencing court to accurately calculate the Guidelines, it may then determine if there are any justifiable departures from the Guidelines, and then consider the Guidelines as but one factor

7

among all of the factors outlined in Title 18 USC 3553(a), to reach a reasonable sentence. United States v. Menyweather, 431 F.3d 692, 696 (9th Cir. 2005), reprinted as amended at 447 F.3d 625, 630 (9th Cir. 2006). A formal determination of "departures," as required under a mandatory guideline system, may be both redundant or unnecessary, under a unitary determination of reasonableness of a sentence.[1] A determination of an allowable departure under the pre-Booker regime, however, may inform the court of the reasonableness of a sentence. United States v. Mohamed, 459 F.3d 979, 986-87 (9th Cir. 2006). See, also, United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006) (the district court is to first calculate the Guidelines accurately and then examine the sentence for reasonableness in light of 18 USC 3553(a)). Further, the court said, "An error in determining the Guidelines range, or in understanding the authority to depart from that range, can prevent district courts from properly considering the Guidelines." Menyweather, id, at 630.[2]

The Court must now consider 18 U.S.C. 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider –

---

[1] "The system of downward departures that still guides the sentencing court's determination of the Guidelines-recommended range as required under § 3553(a)(4) does not preclude the court's discretion to consider other § 3553(a) factors. . . . Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime." United States v. Garcia, 497 F.3d 964, 971-72 (9th Cir. 2007).

[2] A sentencing court's interpretation of the Guidelines is reviewed de novo, United States v. Hernandez, 476 F.3d 791, 802 (9th Cir. 2007); factual findings are reviewed for clear error, United States v. Kimbrew, 406 F.3d 1149, 1152 (9th Cir. 2005); application of the Guidelines to facts of the case involves an intracircuit conflict, as it is either reviewed for abuse of discretion (Kimbrew, id) or *de novo* (United States v. Williamson, 439 F.3d 1125, 1137 n.12 (9th Cir. 2006), see also United States v. Staten, 466 F.3d 708, 713 n.3 (9th Cir. 2006) (discussing the conflict).

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed --

    (a) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

    (b) to afford adequate deterrence to criminal conduct;

    (c) to protect the public from further crimes of the defendant; and

    (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

The sentencing court is now required to consider factors that the Guidelines effectively prohibited from consideration (ie: Age, USSG 5H1.1; Education and Vocational Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3; Physical Condition Including Drug or Alcohol Dependence, USSG 5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities, USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and Military Contributions, USSG 5H1.11; and Lack of Youthful Guidance, USSG 5H1.12.). United States v. Ameline, 409 F.3d 1073, 1093 (9th Cir. 2005) (en banc). To consider the "history and characteristics of the defendant," the Court must now consider factors the Guidelines previously eschewed.

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

> ". . . Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence if imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall, id., at 599.

9

In order to meet the mandate of the <u>Booker</u> remedy, this court must calculate the appropriate guidelines range and may consider appropriate departures. It must also apply the 3553(a) factors and address any other specific characteristics of the defendant or his offense that might impact the determination of a "reasonable" sentence under the particular circumstances of this case. The district court's sentencing decision will then be subject to an abuse-of-discretion review by the circuit.

### IV. A REASONABLE SENTENCE

There are fundamentally four bases for the Court to consider a mitigated sentence in this case: (1) the Guideline range, when considering all of the factors in this case, overstates the seriousness of Earl Nelson's offense behavior; (2) this offense behavior is clearly aberrant in the life of Earl Nelson; (3) Mr. Nelson cooperated with the Government and has earned a reduction pursuant to USSG 5K1.1; and (4) he is also 68 years old and suffers from a number of serious medical problems. The Probation Officer recognizes the aberrant nature of this offense and Mr. Nelson's role in this offense as factors warranting a variance from the established Guideline. The recommendation of the Probation Officer does not factor in Mr. Nelson's cooperation with the Government, nor does it include consideration of Mr. Nelson's age and medical condition. It is urged upon the Court to consider these additional factors when sentencing Mr. Nelson.

      1. **Guideline Overstates the Seriousness of Mr. Nelson's Conduct:** As he has fully acknowledged, Earl Nelson made a significant mistake in the conduct of his professional life. Due to the unusual nature of the E-Rate bids and the manner in which Judy Green instructed Inter-Tel to participate in the bidding process, Earl repeatedly sought the advice of higher authority in the company and followed directions. As a result, Earl Nelson bid to the

specifications that were requested in each proposal.  Inter-Tel employees told Mr. Nelson that Ms. Green informed them that if they wanted to participate in the West Frenso project., Inter-Tel should not submit a direct bid, but rather a subcontractor bid to Howe Electric. In accordance with the guidance he received from corporate and legal, Mr. Nelson acquiesced in the decision to bid as a subcontractor.   Mr. Nelson's branch office delivered all of the equipment for the which the bids were submitted to the corresponding districts.

Later, Judy Green approached Earl Nelson, through his subordinates, about entering into a marketing and management agreement.  Once again, he sought guidance from both Inter-Tel's senior executives and legal department in Phoenix, Arizona.  These departments advised Earl Nelson that he should not be involved in this agreement and that they would handle it. In fact, he never even saw the final agreement. Although Earl Nelson did not personally benefit from Inter-Tel's involvement in the E-rate program beyond his remuneration as a employee, his company did.

When the government decided to indict individuals in this case, it is important to note that those with greater responsibility for Inter-Tel's involvement in this offense went uncharged and unpunished because of a prosecutorial decision, fully within the Government's prerogative, on how the case was investigated and who was prosecuted.

Early on in the investigation of the case, the vice-president of National and Government Accounts, cooperated with Government and was granted immunity. The vice-president had consolidated all of Inter-Tel's E-Rate bids into one corporate department, National and Government Accounts, so that Inter-Tel could nationally compete for E-Rate bids. General counsel was not prosecuted. He was also one of the individuals who instructed Earl Nelson to go

forward. The direction of higher authorities in the company, which Earl Nelson followed, does not exonerate Earl Nelson of responsibility, as his guilty plea exemplifies. However, these directives certainly mitigate the seriousness of Earl Nelson's actions.

It is also important to note that those who sought out and prepared the bids also went uncharged and unpunished. Inter-Tel's number one salesman, who first brought the E-Rate opportunity to Earl Nelson and who became the general manager of an Inter-Tel branch in Salt Lake City, was granted immunity. In fact, a salesman who prepared pricing for the bids and frequently met with Judy Green and the technological director who chose the equipment for the bids, were both granted immunity.

Earl Nelson unfortunately became the "face" of Inter-Tel for purposes of this prosecution, because of his position as the Emeryville branch general manager. He was ultimately responsible for not only the actions of his employees, but for his acquiescence to subcontract the bid. It is for that reason he plead guilty.

As stated by the Government (Government's Memorandum and Motion For Downward Departure, p.4. Line 7), it is questionable how well Mr. Nelson was apprised of his subordinates' actions involving Ms. Green and just how well he understood his subordinates' actions. He acted within the hierarchical structure of Inter-Tel, rather than behaving as a "rogue element", seeking to circumvent the company policy.

The government acknowledges (Government's Memorandum and Motion For Downward Departure, p.4. Line 6-10) that Mr. Nelson was the supervisor of several employees who actually worked directly with Ms. Green on the E-Rate bids. Likewise, the government admits that it is unclear as to whether Mr. Nelson's employees kept him abreast of the details of their behavior as

things progressed. Finally, the government acknowledges that as a supervisor, Mr. Nelson has accepted responsibility for the activities of his subordinates, even though he sought counsel from others within the corporate hierarchy.

Mr. Nelson received an upward adjustment of two levels for being an organizer, leader, manager, or supervisor in an activity under the USSG §§ 3B1.1(a) and (b) and (c). While Mr. Nelson is not objecting to the USSG calculation, it must be noted that this overstates the role he actually played amongst the participants involved in the E-Rate projects at Inter-Tel. As described above, his role, when compared to other employees above and below him, was of a minor participant.

The parties have agreed in the Plea Agreement that the "volume of commerce" involved in this offense is between $6.5 million and $15 million, causing an upward adjustment in the Guideline range of four levels. However, according to the Government's calculations, Inter-Tel throughout its involvement with Howe Electric and Judy Green at West Fresno and Highland Park, received approximately $3.6 million, a true volume of commerce in which Inter-Tel and indirectly, Earl Nelson, was involved. $3.6 million would result in an adjustment in the Guideline range of three levels, not four.

Given Earl Nelson's role in the offense, the fact that he sought guidance from higher authorities in Inter-Tel, that he derived no greater compensation for his involvement than his earnings as an employee, and that the amount of money Inter-Tel derived from this offense is less than the agreed "volume of commerce," the Guideline range of Level 13 clearly overstates the seriousness of Earl Nelson's offense behavior. His role in the offense was such that harsh sanctions are not warranted.

2. **Aberrant Act:** In the context of Earl Nelson's over 40 years in the telecommunications industry, his involvement in this offense is clearly aberrant. Even during the mandatory era of Guideline sentencing, courts recognized the appropriateness of mitigated sentences to recognize aberrant offense behavior. See, United States v. Guerrero, 333 F.3d 1078 (9th Cir. 2003), United States v. Takai, 941 F.2d 738 (9th Cir. 1991), United States v. Dickey, 924 F.2d 836 (1991), United States v. Fairless, 975 F.2d 664 (9th Cir. 1992), United States v. Morales, 961 F.2d 1428 (9th Cir. 1992), and United States v. Colace, 126 F.3d 1229 (9th Cir. 1997). From the early days of Guideline sentencing through the decision in Booker, courts have realized that human beings make mistakes that are isolated and not indicative of their character, values, or lifestyle. Consequently, the response of the criminal justice system should take into account aberrant behavior and mete out sentences recognizing that such offenses never occurred before the present offense and will not occur again. This clearly applies to the present case. Earl Nelson retired before this investigation began and at his age, has no intent to return to the workforce. For over 40 years, Earl Nelson performed ethically and honestly. This one lapse should not define him, nor should he be harshly punished for it.

This offense is aberrant, particularly when analyzed in the context of Earl Nelson's full life. He not only had a blemish free career before E-Rate, but has raised three fine sons with his wife Judy, all of whom have their own businesses and are raising their families. Earl Nelson overcame an early adulthood problem with alcohol abuse and served as a sponsor and counselor to other recovering alcoholics. He continues to attend AA meetings, act as a sponsor, and help others. His career, family, and community involvement more accurately define Earl Nelson than do the present charges.

**3. Substantial Assistance:** As the United States has confirmed, Mr. Nelson aided the Government in its investigation and prosecution of others. He was truthful, complete, and timely.

Mr. Nelson provided the Government with significant information and assistance regarding this investigation. Although ultimately not called to testify at trial, Mr. Nelson provided details about the events, gave context and foundation for relevant documents, and was available and willing to testify at trial, had the government called him. When viewed with other information the government possessed, Mr. Nelson's information proved to be accurate and reliable. Throughout his cooperation, he provided truthful, candid, and complete information regarding his role in the collusion, as well as the roles of the other defendants. Mr. Nelson's cooperation, in addition to being entirely truthful, was timely.

4. **Age and Health:** At age 68, Earl Nelson suffers from real medical problems and his physician stated that incarceration for him could result in even more serious medical problems. Dr. Munger wrote:

> "It is my opinion that his age combined with his multiple serious orthopedic problems would make incarceration extremely uncomfortable for him and with his hypertension, he actually is at rather high risk for more serious health problems that could occur such as stroke or heart attack. Please take these facts into consideration in the sentencing process."

The Guidelines themselves take into account Earl Nelson's very circumstances. At USSG 5H1.1, it states:

> ". . . Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

Further, at USSG 5H1.4:

". . . However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

Earl Nelson suffers from a myriad of maladies that would make incarceration difficult for him to endure and would prove costly for the Bureau of Prisons. Mr. Nelson could potentially seriously deteriorate without the expert medical care he presently has at his own expense. Since this case began, Earl Nelson's blood pressure has fluctuated and is currently at an alarmingly high rate. The combination of his age and medical condition warrants a variance from the Guideline range and a sentence that does not include imprisonment.

Therefore, in view of the nature of Earl Nelson's cooperation regarding his participation in this offense, the aberrant nature of his illegal conduct, the Guideline range overstating the seriousness of his conduct, and his age and medical condition, a reasonable sentence would be a sentence to probation and meaningful community service.

Dated: March 12, 2008                                        Respectfully submitted,


                                                             /s/ Richard B. Mazer
                                                             Richard B. Mazer
                                                             Julie Beil
                                                             Attorneys for Defendant
                                                             EARL NELSON